### KLOEN v. EDO AIRCRAFT CORPORATION et al.

Civil Action No. 8565.

District Court, E. D. New York.

March 4, 1948.

Max Kloen, pro se.

Campbell, Brumbaugh & Free, of New York City (Walter H. Free and John F. Neary, Jr., both of New York City, of counsel), for Edo Aircraft Corporation and Pan American Airways.

Charles Kingsley, for Grumman Aircraft Engineering Corporation.

John J. Ryan, of New York City (Charles S. Wilson and Joseph L. Tierney, Jr., of counsel), for Republic Aviation Corporation.

BYERS, District Judge.

This is a patent cause which is prosecuted by the patentee in person although the grant itself was solicited by an attorney.

The issue litigated is that of infringement, although the defendants successfully assert invalidity if the claims can be so distended as to read upon their structures.

United States Patent No. 1,815,303 was granted July 21, 1931, upon Application filed August 28, 1929, and the invention claimed is that of a hydro-speed ship of unique hull construction, one that can travel at 100 knots, by skimming across the upper surface of the water, propulsion being by air propellers on deck.

The vessel, as proposed, is to be waterborne, but the resistance of the water "is reduced to a minimum" through relationship of the parts so that "the surface of the water will merely serve as a partial support for the weight of the vessel".

It is perhaps superfluous to observe that there has been no embodiment of the invention recited in the patent, but a model was built of the hull structure as conceived, which is in evidence. The proportions are indicated as shown by a length of 280 feet, width 27 feet, and depth 10½ feet.

Accomplishment of the proclaimed purpose of the invention is to be attained through two agencies:

(a) Two tunnel-like structures which run fore and aft for the entire bottom of the vessel on either side of the central fin or keel, as shown in Fig. 4, between the upturns of the hull at the bow and stern. This is the basis of the plaintiff's claim of infringement, and will be briefly discussed.

(b) A series of arrow-shaped blades which project down from the central fin or keel, and from the bottoms of the outer walls of the lateral tunnels, the lateral fins, which are referred to above. The dimensions of these blades are not given, but Fig. 2 discloses that they are numerous and are disposed beneath, but attached to, the three fins. These blades incline downward from front to rear and, as to those on the lateral fins, are called "supporting elements", which rest on the upper surface of the water and cooperate with the latter "to maintain the boat at a level where these two rows of blades 42 and 43 just graze or skim the water".

The blades attached to the keel fin "extend beneath the surface of the water and thus serve in effect as *anchors* to *anchor* the boat to the water". (Italics supplied.)

This latter agency, the assembly of blades, is not relied upon to establish infringement, and in face of the uncontradicted testimony, any contention to the contrary would be idle.

The tunnels alone constitute the offense imputed to the defendants, and are the only subject which requires attention.

The following is quoted from a memorandum filed by the plaintiff to vindicate the above statement:

"5. That Letters Patent No. 1,815,303, outlines original means for an 'Air-intake Bow', to overcome vacuum, suctions and resistance for take-off and landing of Seaplanes and Floats, as per Statements of drawings, under 'To Whom It May Concernes (sic)'."

"16. That the invention is a hull with highest percentage of 'Seaworthiness', regardless of weather-conditions, also of 'Safety and Speed', so well expressed in its entire structure, able to reach the far

distant points with maximum reserve fuel left in its tanks.

"17. That the most common but hazardous problem till then prevailing was, 'bottom-rip' for ship and Sea-plane alike, as well as, 'nose-diving', where waves would wash completly (sic) over the bow, of the hull;—this and the turning into the wind or by change of the course, where the impact of side-rolling waves have caused severest damage, *for which the sharp concave vee keel with its downward water spray, was originally invented by the plaintiff, and outlined in his Letters Patent No. 1,815,303.* (Italics supplied.)

"18. That no prior Art has these principles, and the inventor achieved 'success' on his own merits without consulting prior Art, and could not do so, for he was not in this Country.

"19. That these invented principles have been adopted by the Sea-plane industries without the inventors consent, for it is the very answer for their then existing handicaps, which prevented this industry from success."

As the result of a pretrial hearing, the following stipulation was entered into on November 25, 1947, and filed:

"It is hereby stipulated and agreed by and between the plaintiff and the attorneys for defendants, for the purposes of this suit, as follows:

"1. That the plaintiff, Max Kloen, is an inhabitant of the State of New York and a resident of the Eastern District of New York, residing at 25 Pearsall Place, Roslyn Heights, Long Island, N. Y.;

"2. That title to United States Letters Patent No. 1,815,303, issued July 21, 1931 is vested in the plaintiff, Max Kloen, and that since issuance thereof, plaintiff has been and still is the sole and exclusive owner thereof and of all rights, claims and demands arising out of any infringement thereupon;

"3. That defendants subsequent to the issuance of the aforesaid United States Letters Patent No. 1,815,303 and within six years prior to the commencement of this action has (sic) used or caused to be used certain aircraft identified by the following type numbers:

| "Boeing | 314 |
| "Consolidated | Commodore |
| "Martin | 130 |
| "Sikorsky | 38 |
| " | 40 |
| " | 42 |
| " | 43 |
| "Grumman | 21 |
| "        (Duck) | 44 |
| " | 73 |
| "Stinson | Reliant |
| "Edo | Floats |
| "Republic | 2 PA |
| " | Sea Bee. |

"4. That the plaintiff charges that only the aircraft identified in paragraph 3 hereof infringe claims 1, 2, 3, 4 and 7 of his said Letters Patent, and that he will rely on said claims at the trial.

"5. * * *"

The four defendants now in the case (the fifth was never served) are:

Edo Aircraft Corporation, a manufacturer of sea-plane floats; Pan American Airways, Inc., not a manufacturer but a company which has operated some of the accused aircraft; Grumman Aircraft Corporation, and Republic Aviation Corporation, also manufacturers of accused aircraft.

The patent contains seven claims of which all but the sixth are in issue. The broadest is the first:

"1. A vessel having a hull of greater width than depth forming a water displacement of greater width than depth, said hull composed of a longitudinally extending upper face convex in cross section, a plurality of longitudinally extending lower faces concave in cross section to form a deep centrally extending stabilizing fin, two lateral fins of less depth, the concave faces which form the outer faces of the lateral fins forming with said upper face diminished longitudinally extending lateral edges, air propellers for propelling said vessel, and means for guiding said vessel."

Claim 2 adds to the above in reference to the upper aspect of the lateral fins at the deck "forming * * * sharp wave-cutting longitudinal edges".

The remaining claims expose no facets of alleged patentable invention necessary to present consideration.

The case for the plaintiff is that the defendant manufacturers have adopted his two-tunnel teaching in designing the under bodies of their amphibian craft; that is, they employ a Vee-shaped hull having an outboard flare rising from the keel, ending with a turndown lip or flange, i. e., a water deflecting element, best shown in Fig. 4 of the drawings of Curtiss patent No. 1,246,012 (November 6, 1917), which is asserted to be the same as the "sharp wave-cutting longitudinal edges" taught by Claim 2 of Kloen's patent.

At some risk of redundancy, and because it seems important that the plaintiff's own view of his case should be understood since he is his own advocate, the following is also quoted from a memorandum, filed by him by way of reply to the brief of defendants Edo Aircraft Corporation and Pan American Airways, Inc., which he entitles "Plaintiff's Finding of Facts":

"10. That this invention gave the Seaplane builders the much needed principles for successful operation and a successful business.

"11. That the engagement of these principles is a change of 'design'; not only for the needed 'downward water spray' but to overcome the suctions and resistance for perfect take-off and a perfect landing, without bottom-rip, which was the great cause for disaster.

"12. That the attorney for the plaintiff's patents, Mr. Drews and the two men, Mr. Korvin-Kroukovsky and Mr. Brandenburg not only knew the fact of downward water spray from the plaintiff, but that this was the promise for backing such invention.

"13. That the many Curtiss patents, (10 or 12) as well as, the Edo or any other Aviation patent, with their flat or streight (sic) V bottom structures could not produce a 'downward water spray' is a scientific fact, for 'Nature takes its own course'."

That document also criticises the attorney for those defendants for not producing drawings and photographs in connection with United States Letters Patent No. 1,726,439, but the record shows that such a photograph was produced, handed to the plaintiff, and offered by him as his Exhibit 31. The criticism is unjust and will be disregarded.

It is important to remember that the conception of the plaintiff is evidently a craft designed to travel on the surface of the water, or as close to it as the functions of the central fin and blades will permit, and at high speed because the area of water resistance is reduced to a minimum; progress of such a craft therefore would be continuously horizontal.

He describes the function of the tunnels both as water passages "to reduce the water resistance but also as air passages in that the water displacement of the hull * * * will be such that the upper" portions of the tunnels "will be disposed above the level of the water normally, and consequently air as a result will pass through such upper portion and thus still further reduce the resistance to travel which would result if such portions of the faces (i. e., upper portions of the tunnels) were engaged by the water".

This is understood to mean, in a general way, that the air in the tunnels, lying above the water enclosed by them, would be less resistant to forward progress, than if the top of the tunnels lay at or slightly below the surface so that the tunnels would be filled entirely by water.

Since the problem, as this inventor saw it, dealt with progress through and along the water, he was concerned with forward speed.

The accused aircraft were necessarily designed with a view to making a slanting or diagonal change in levels, that is, toward the water from an air-borne position, at the end of a flight; or rising into the air at a take-off from the water. The first operation is a braking one; in the second, speed in rising to become air-borne is the obvious purpose, so that, at best, only this aspect of the problem of design, namely, making speed during a brief water-borne interval, can be thought of as resembling this patentee's problem. But since there could be only one form of

structure employed by defendants to accomplish both purposes, it is to be expected that the difference in the nature of the problems would necessarily be expressed in differences in design.

Attention is necessarily drawn to the entire absence of anything in the hull bodies of the accused structures that can be thought of as tunnel walls, that is to say, the lateral fins 26 and 27 in Fig. 4 of the patent drawings.

In the models in evidence, there is shown a restricted concavity adjacent to the keel, starting near the bow, which flattens out laterally and terminates at what is called the step in the keel as shown in Fig. 1 of the said Curtiss patent No. 1,246,012.

The V-shaped bottom, with the curvature indicated, is explained in the testimony as forming a cut-water with a turned down edge, or spray strip at the chine or termination of the inclination, to keep the water from rising, and the spray from getting into the propeller—a spray deflector.

With reference to Korvin-Kroukovsky Patent No. 1,726,439 (Prior Art, Western States Machine Company v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345)—a disclosure of an underbody of floats, pontoons, etc., having two or more shallow incurves or ridges to reduce water friction at take-off—the testimony is that lifting action is not thereby facilitated, and that there is no relation between the reduction of friction and the lifting action, which is of course supplied by the wings.

So that, even to the extent that the reduction of water friction, which this patentee speaks of, is common to his conception and to the design of amphibian aircraft, the Korvin-Kroukovsky Patent No. 1,726,439 shows that the pertinent art was equipped with means to overcome it.

The longitudinal termination of the flare in the hulls of these planes, at the step which is about amidships, explains the absence in all of these hulls of the tunnels of which this patentee speaks; they run fore and aft for almost the entire length of his center fin or keel; thus, as his craft moves through the water, there is no impediment presented at the aft end of the keel to provide resistance to the water. If there be imagined a flow of water alongside the keel on either side, it would emerge at the stern exactly as it entered at the bow. Of course there is no such flow, but the movement of the patentee's hull through the water, to which it is "anchored" by the central fin or keel, would create such an illusion.

The problems in design being wholly dissimilar, it is apparent that their respective solutions are not in conflict.

The keel of the accused structures cannot be thought of as serving the same purpose as the central fin of Kloen's hydro-speed ship, which is to "anchor" the hull to the element in which it is designed to function; and the same is true of that portion of the accused hulls which is called the chine, as compared to the lateral fins of the plaintiff's patent where they and the attached blades ride upon the water, "forming with said upper face sharp wave-cutting longitudinal edges" (Claim 2).

▮ The various types of amphibian airplanes which are listed in the stipulation quoted above have been the subject of exposition by models, drawings and photographs, so that the underbody construction of each has been fully shown, and none of them reveals even partial infringement of the invention disclosed in the patent in suit. The testimony is clearly to the effect that they are adaptations of the fundamental hull design found in the Curtiss Patent No. 1,246,012, granted nearly thirteen years before the plaintiff's filing date. The modification or development shown in the Korvin-Kroukovsky Patent No. 1,726,439, granted one day prior to the Kloen filing date, teaches the hull design found in Edo Float Model 68—9860.

This means that, if the Kloen patent by any attenuated theory of construction could be seen to embody a disclosure which has found expression in the accused hulls, the grant itself would be denied validity as failing to portray patentable invention.

▮ Moreover, the plaintiff is estopped to assert any such scope of invention as is now asserted against the aircraft referred to in the stipulation, by reason of the with-

drawal of all his original claims—see particularly Claim 3—and in favor of the narrower ones which were finally passed.

It results that there must be a decree for the defendant companies, with one bill of costs.

Since there are various structures of different manufacture involved, I suggest that defendants' counsel jointly formulate brief findings which shall be specific as to the various aircraft listed in the stipulation, and a conclusion, all as indicated herein, and serve a copy on the plaintiff by mail on 5 days' notice, together with a form of decree as proposed.